IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| United States of America,<br><br>    v.<br><br>1866.75 Board Feet and 11 Doors<br>and Casings, More or Less, of<br>*Dipteryx Panamensis* Imported from<br>Nicaragua,<br>    Defendant,<br><br>Jill Thompson and Wilbur Thompson,<br>    Claimants. | )<br>)<br>)  Case No. 1:07cv1100(GBL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM ORDER

THIS MATTER is before the Court on the Government and
Claimants Jill and Wilbur Thompsons' Cross Motions for Summary
Judgment. This case concerns the importation of the defendant
wood by the Thompsons at the termination of their foreign service
with the United States Department of State in Nicaragua.
*Dipteryx Panamensis* is as an endangered species and therefore
cannot be imported to the United States without a Certificate of
Origin (subject to certain limited exceptions). The Thompsons
imported defendant wood without this Certificate and the
Government subsequently seized the wood, which in turn commenced
this judicial forfeiture action. There are several issues before
the Court. The first issue is whether the defendant wood,
several tons of parquet floor squares, doors and casings, is
properly categorized as a household effect so as to be exempt

1

from the Certificate of Origin requirement. The second issue is whether the Thompsons are entitled to an innocent owner defense.

The third issue is whether there is a statute of limitations for the Government to institute this case. If so, the Court must determine whether the Government initiated this action within the applicable statute of limitations and if a failure to do so precludes judgment in favor of the Government. The fourth issue is whether the Thompsons were deprived of due process through the forfeiture of their property pursuant to a statute that failed to provide fair notice of prohibited conduct. The fifth issue is whether the Government properly valuated the property and whether an improper valuation would mandate judgment for Claimants. The sixth issue is whether the forfeiture of the defendant wood constitutes an excessive penalty under the Eighth Amendment.

The Court holds that the defendant wood does not constitute a household effect because several tons of parquet flooring, doors and casings are building or construction materials that cannot be deemed "household effects". The Court holds that the Thompsons are not entitled to an innocent owner defense to civil forfeiture because they were responsible for the conduct that constituted the violation. The Court also holds that the statutorily mandated time frames indicated by Claimants refer to administrative, not judicial forfeitures, and are therefore inapplicable to this action. Even if the time frames were

2

applicable, a failure to bring the action within the time frame would not entitle Claimants to summary judgment. The Court also holds that the statutory provisions at issue in this matter are not unconstitutionally vague because a reading of the statute, would put a reasonable person on notice of the prohibited conduct. The Court also holds that the proper valuation of the defendant wood does not impact the ultimate procedural posture of this matter, and an incorrect valuation would not mandate summary judgment in favor of Claimants. Finally, the Court finds that the Claimants have failed to carry their burden as necessary to prevail on summary judgment with respect to the excessive fines clause claim because they have neglected to address any of the elements considered by the Court in declaring a forfeiture grossly disproportionate.

## I. BACKGROUND[1]

Jill and Wilbur Thompson were State Department employees stationed in Managua, Nicaragua in the fall of 2006. Prior to their departure from Nicaragua, the Thompsons purchased the defendant wood[2] at a furniture and wood products exposition

---

[1] This matter has a long, protracted and contentious history, as demonstrated by the quantity of correspondence exchanged between the parties, as well as the sheer volume of pleadings filed and hearings held. This section merely attempts to summarize the most salient aspects for this analysis.

[2] The defendant wood is as described in the caption. To paint a clearer picture of the quantity of wood involved, the shipment consisted of seven crates weighing 10,833 gross pounds, and constituted 2,489 square feet of wood flooring.

3

sponsored by the governments of Nicaragua and the United States.

Upon receipt of their transfer orders, the Thompsons arranged to have their belongings (including the defendant wood) shipped to the United States by the United States Embassy. Upon arrival in the United States (and after clearing customs) it came to the attention of the State Department that the shipment of the Thompsons' personal belongings contained a significant amount of wood, and the shipment raised a concern as to whether these materials were properly shipped to the United States. After an initial inspection, the State Department indicated to the Thompsons its concern that the defendant wood was more appropriately categorized as "building materials" and therefore not properly designated as household effects shipped by the government. Subsequent to this initial inspection, the Thompsons and various government officials, both international and domestic, exchanged a significant amount of correspondence seeking the release of the property. In the course of these exchanges, the Thompsons identified the wood as *Dipteryx Panamensis*. The State Department, during this time, also took many photographs and samples of the defendant wood, and submitted it for multiple appraisals.

Having identified the wood as *Dipteryx Panamensis*, the United States Department of Agriculture referred this matter to the United States Attorney's Office for the Eastern District of

Virginia, who in turn commenced this judicial forfeiture action.

After an extremely contentious and protracted period of motions practice and discovery, this matter is presently before the Court on the Government and the Thompsons' Cross Motions for Summary Judgment.

## II. DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v.*

5

*Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).
Whether a fact is considered to be "material" is determined by
the substantive law, and "[o]nly disputes over facts that might
affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." *Anderson*, 477
U.S. at 248. Rule 56(e) requires the nonmoving party to go
beyond the pleadings and by its own affidavits, or by the
depositions, answers to interrogatories, and admissions on file,
designate specific facts showing that there is a genuine issue
for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## B. Analysis

### 1. Forfeitability

The Court grants summary judgment in favor of the Government
as to forfeitability because the Government has established by a
preponderance of the evidence that: (1) the defendant wood is of
a species listed in Appendix III of the Convention on
International Trade in Endangered Species of Wild Fauna and Flora
("CITES"); (2) it was imported into the United States from
Nicaragua without a valid Certificate of Origin as required; and
(3) it is not subject to the statutory exception to the
Certificate of Origin requirement for household effects.
Pursuant to the provisions of the Endangered Species Act, "[a]ll
... plants ... imported contrary to the provisions of this
chapter, any regulation made pursuant thereto, or any permit or

certificate issued hereunder shall be subject to forfeiture to the United States." 16 U.S.C. § 1540(e)(4)(A).[3] Under CITES it is therefore "unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention, including the definitions of terms in article I thereof." 16 U.S.C. § 1538(c)(1).

Owing to an intervening change in the statutes regulating CITES forfeiture between the time shipment and seizure of the defendant wood and the initiation of this lawsuit, the Court takes a brief moment to further outline the timing of this matter as well as the intervening changes in case law and the impact of the changes on the disposition of this action[4]. The Thompsons' property was imported to the United States and subsequently seized in the fall of 2006. The Complaint in this matter was filed on October 31, 2007. The instant Motions for Summary Judgment were filed in the spring of 2008. In 2006, the regulations made pursuant to chapter 35 of title 15 were codified at 50 C.F.R. §§ 23.11, 23.12, and 23.13. Section 23.11 generally

---

[3]The "chapter" referred to in the statute is chapter 35 of title 15, United States Code, which includes 16 U.S.C. §§ 1531-44. The provision relating to CITES is Section 1538(c)(1), and the regulations made pursuant to that statute are codified at 50 C.F.R. §§ 23.11.

[4]The Court is unsure why neither party deemed it appropriate to raise this in the extensive and exhaustive briefs filed in light of the illuminating effect it has on one of the central issues before the Court.

addressed prohibitions, while § 23.12(a)(3) codified the
requirements for a Certificate of Origin for the importation of
items listed on Appendix III, with § 23.13(d) indicating that,
"[t]he prohibitions in § 23.11(b) through (d) concerning
importation, exportation and re-exportation shall not apply to
wildlife or plants that are accompanying personal baggage or part
of a shipment of the household effects of persons moving their
residences to or from the United States." 50 C.F.R. §§ 23.11,
23.12, 23.13(d)(2006). Looking for further explication of the
intended meaning of "household effects" both the Government and
Claimants point to CITES Conference Resolution 13.7 defining
"household effects" as "specimens that are: a) personally owned
or possessed for non-commercial purposes; b) legally acquired;
and c) at the time of import, export or re-export are either: I)
worn, carried or included in personal baggage; or ii) part of a
household move." Convention on International Trade in Endangered
Species of Wild Fauna and Flora [CITES], *Control of trade in
personal and household effects*, Conf. Res. 13.7 (Oct. 4, 2004).

Effective September 24, 2007, the Department of the
Interior, United States Fish and Wildlife Service (FWS) revised
the regulations implementing CITES, specifically 50 C.F.R. § 23.
Revision of Regulations Implementing the Convention on
International Trade in Endangered Species of Wild Fauna and Flora
(CITES), 72 Fed. Reg. 48,402 (Aug. 23, 2007)(to be codified at 50

8

C.F.R. § 23). In doing so FWS indicated that, "in this final
rule, we have retained most of the general information in the
current 50 CFR part 23, but reorganized the sections and added
provisions from certain applicable resolutions and decisions
adopted by the CITES Conference of the Parties (CoP) at its
second through thirteenth meetings (CoP2-CoP13)." *Id.*
Subsequently sections 23.11 and 23.12 were deleted from section
23. Section 23.11 is now encompassed within the provisions of
section 23.13. 50 C.F.R. § 23.13 (2007). The Certificate of
Origin requirement originally located in Section 23.12 has been
included in 23.15. 50 C.F.R. § 23.15 (2007). Most significantly
however, the revised section 23 clarifies the definition of
personal and household effects and presently reads as follows:

> (d) *Personal effects.* You do not need a CITES
> document to import, export or re-export any legally
> acquired specimen of a CITES species to or from the
> United States if all of the following conditions
> are met:
> (1) No live wildlife or plant (including eggs
> or non-exempt seeds) is included.
> (2) No specimen from an Appendix-I species is
> included, except for certain worked African
> elephant ivory as provided in paragraph (f) of this
> section.
> (3) The specimen and *quantity* of specimens are
> reasonably necessary or appropriate for the nature
> of your trip or stay and, if the type of specimen
> is one listed in paragraph (c)(3) of this section,
> the quantity does not exceed the quantity given in
> the table.
> . . .
> (e) *Household effects.* You do not need a CITES
> document to import, export or re-export any legally
> acquired specimen of a CITES species that is part
> of a shipment of your household effects when moving

9

> your residence to or from the United States, if all
> of the following conditions are met:
>     (1) The provisions of paragraphs (d)(1)
> through (3) of this section are met.
>     (2) You own the specimen and are moving it for
> personal use.
>     (3) You import or export your household
> effects within 1 year of changing your residence
> from one country to another.

50 C.F.R. §23.15(d)&(e)(2007)(emphasis added). The Court finds

that the 2007 revisions changed neither the substance nor the

spirit of the regulations as they existed in 2006. If anything,

the revisions have merely promulgated a clearer version of these

regulations, and it is therefore appropriate for the Court to

take notice of the amended statute. Although the regulation as

it appeared in 2006 would have been different than today had the

Thompsons consulted it prior to the exportation of the defendant

wood, the Court recognizes that both parties cited Conference

Resolution 13.7 as providing guidance regarding the household

effect exception, and the FWS indicates that the provisions of

Conference 13 were included in this revised version of the

statute.  Therefore in the section of this analysis where the

Court discusses the application of the exception for household

effects to the facts of this case, the Court finds it appropriate

to consult the amended statute in order to glean further insight

into the intended application of the exception.  In order to be

granted summary judgment on the issue of forfeitability, the

Government has the burden to demonstrate that there is no genuine

issue of material fact that: (1) the defendant wood is a species found in Appendix III of CITES; (2) it was imported from a foreign country; (3) no valid Certificate of Origin was obtained; and (4) the wood cannot be designated as a household effect so as to exempt it from the Certificate of Origin requirement.

### a. Defendant wood is a species listed in Appendix III of CITES

The Court finds that there is no genuine issue of material fact for trial as to the identification of the defendant wood as *Dipteryx Panamensis*, which is listed in Appendix III of CITES. There is no dispute between the parties that *Dipteryx Panamensis* is included in Appendix III. Therefore the only issue to resolve is whether the defendant wood is *Dipteryx Panamensis*. The Government has provided significant support for its position and conclusion that the defendant wood is *Dipteryx Panamensis*. Included in this body of evidence are multiple written admissions by the Thompsons that they believed the wood to be *Dipteryx Panamensis*, and information from the manufacturer's website (provided by the Thompsons) identifying the wood as *Dipteryx Panamensis*. (Govt. Mot. Summ. J. Ex. 1, 2 & 3.) Furthermore the Government had multiple specimens of the defendant wood analyzed by Mr. Alex Wiedenhoeft, a botanist and expert on the identification of wood samples, who is employed by the United States Forest Service Laboratory, Center for Wood Anatomy

11

Research. Mr. Wiedenhoeft has completed extensive study on the subject of wood anatomy and authored scholarly articles and treatises on the subject as well. (Govt. Mot. Summ. J. Ex. 4.) He has also been cited as an expert in wood identification in a research paper in Science magazine. (*Id.*) Drawing upon his extensive background, and what he knew and saw of the wood, Mr. Wiedenhoeft concluded that the wood was in fact *Dipteryx Panamensis*. (*Id.*) In response to the Government's evidence, Claimants devote significant energy to undermining the conclusion indicated by the evidence posited through the presentation of argument amounting to mere speculation and conjecture. The Court tends to agree with the Government's characterization of Claimants' efforts on this point that, "Claimants devote eleven pages to disputing the scientific identification, impeaching their own prior admissions, and attempting to create a genuine issue of fact by relying on the eleventh-hour speculation of a witness from Nicaragua—never previously identified in any way in discovery—that other species of wood may have been fraudulently substituted for the *D. Panamensis* that Claimants thought they had purchased." (Govt. Opp. Cl. Mot. Summ. J. 15.) Claimants have submitted nothing to the Court that rises above the level of speculation and conjecture, as required to create a material issue of genuine fact in order to defeat a motion for summary judgment. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649

12

(4th Cir. 2002). Similarly, the Court finds the Thompsons' arguments that the Government has failed to meet its burden with respect to the doors and casings unpersuasive. Claimants' entire position seems to be based on the fact that the Government, despite testing wood from six of the seven crates seized, failed to take and test samples from the crate containing the doors. Once again Claimants expend significant energy in attempting to poke holes in the evidence presented by the Government through speculation, and neglect to present any affirmative evidence of their own that would allow this Court to conclude that a genuine issue of material fact exists as to the identity of *any* of the defendant wood. Based on the evidence presented by the Government, and the failure of Claimants to adduce any affirmative evidence that would support a finding of the existence of a genuine issue of material fact, the Court holds that the defendant wood is in fact *Dipteryx Panamensis*, a species listed in Appendix III of CITES.

Neither party contests that defendant wood was imported to the United States from Nicaragua, therefore the Court declines to devote additional analysis to this point.

## b. No Certificate of Origin was obtained which would exempt defendant wood from CITES

Furthermore, the Court finds that Claimants did not obtain a Certificate of Origin as required for the importation of defendant wood. The evidence produced by the Government

13

indicates that it has conducted a thorough search that would have produced evidence of a Certificate of Origin for the defendant wood if one in fact existed. (Govt. Mot. Summ. J. Ex. 9.) Claimants never declare that they obtained a Certificate of Origin for the wood. Furthermore, they never affirmatively claim that anyone else obtained one on their behalf. The most that Claimants provide is a statement in their Motion for Summary Judgment that "[o]n August 23, 2007, the Management Authority issued a signed, sworn statement (a "Constancia")... declaring that no Nicaraguan laws had been violated when the Thompsons' household effects were exported from Nicaragua in 2006." (Cl. Mot. Summ. J. 15.) Setting aside an inability to locate this document in the record, the Court takes note of two exhibits attached by Claimants to their Motion. Claimants have offered an email from Paula Bravo, of the U.S. Embassy in Nicaragua, dated February 8, 2008, that reads:

> Jill and Lee: This is to let you know that Ing.
> Rene Salvador Castellon at MARENA confirmed that at
> this moment they are not issuing Certificates of
> Origin. In our case, they will issue a
> "constancia" where they would explain that because
> of a Ministerial Resolution MARENA is not issuing
> Certificates of Origin for the type of wood in
> question.

(Cl. Mot./Opp. Summ. J. Ex. 21). This is in contradiction to the email attached to Claimants' Motion as exhibit 19. In this email exchange dated October 30, 2007, wherein Bud Petit de Mange requested that a co-worker translate an email he received from

14

the aforementioned Rene Castellon (MARENA). The email
translation reads as follows:

> Quick Translation: Dear Mr. Albert: If we have been
> asked at that time, we would have issued a
> Certificate of Origin once coordinated and verified
> with the National Forestry Institute, which is the
> Organization that guarantees the legal origin of
> the wood. As previously mentioned, we didn't get
> any request for a permit or information from Mr.
> and Mrs. Thompson when they conducted the
> exportation procedure.

(Cl. Mot./Opp. Summ. J. Ex. 19.) At most this evidence submitted
by Claimants serves to create a genuine issue of material fact
regarding the policies in Nicaragua as to the issuance of a
Certificate of Origin, but does nothing to create an issue of
fact as to whether the certificate was obtained, as both indicate
that one was not. In fact, Claimants have posited neither
argument nor evidence that creates a genuine issue of material
fact on this point. The bulk of their argument surrounds whether
the certificate was required in the first instance. Having found
that a Certificate of Origin was not obtained by the Thompsons or
anyone acting on their behalf for the exportation of defendant
wood, the Court moves on to determine whether the defendant wood
qualifies for designation as a household effect so as to be
excepted from the Certificate of Origin requirement.

### c. The household effects exception does not apply to building or construction materials

Finally, the Court holds that the defendant wood does
not fall within the household effects exception to the

Certificate of Origin requirement because several tons of parquet flooring, doors, and casing are building and construction materials that cannot be deemed "household effects". At the time the goods were acquired and exported, Section 23.13(d) delineated the household effects exemption as follows, indicating that the CITES Certificate of Origin requirement, "shall not apply to wildlife or plants that are accompanying personal baggage or part of a shipment of the household effects of persons moving their residences to or from the United States." 50 C.F.R. § 23.13 (2007). As previously stated it is appropriate for the Court to be guided by the recently revised 50 C.F.R. § 23.15(d)&(e), however in its revised form the regulation still begs for a brightline rule or explicit guidelines. Where the statute does not provide an express definition for the term in question, "we construe [the] statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).[5]

> Where a statute is ambiguous, judicial construction
> must be used to ascertain the legislative will; in

---

[5] The Court notes that the D.C. Circuit was asked to examine a different CITES provision and found that "[w]e must give substantial deference to an agency's interpretation of its own regulations. . . .[T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Castlewood Prods. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004)(internal citations omitted). Both the Department of the Interior (through FWS) and the Department of Agriculture (through APHIS) are charged with the enforcement of the Endangered Species Act, and in turn, CITES. The Court notes that the Government has submitted an affidavit from Mr. Andrew Petit de Mange, Supervisory Agriculturist at the U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Plant Protection and Quarantine (PPQ), wherein Mr. Petit de Mange represents that APHIS has interpreted and applied the term "household effects" as "the furnishings and other contents actually used in one's home, and to exclude building or construction materials intended to be used in the future but not previously used in one's home." (Petit de Mange Aff. Ex. 9 ¶ 11).

16

> such circumstances, the courts must determine the
> intent of the legislature in enacting the statute
> and construe the statute in a manner that reflects
> that intent. In this regard, it has been said that
> in interpreting ambiguous statutes, courts may
> examine the object sought to be attained by the
> statute, laws upon the same or similar subjects and
> the consequences of a particular construction.

73 AM. JUR. Statutes § 113.

Black's dictionary defines "effects" as "movable property;
goods." BLACK'S LAW DICTIONARY (8th ed. 2004). "Effects" in the
legal context is contained in the Constitution in the context of
the Fourth Amendment protection of "[t]he right of the people to
the secure in their persons, houses, papers, and effects…." U.S.
CONST. amend IV. The Fourth Circuit, in interpreting the bounds
of the term "effects" in that context concluded that at the time
the Fourth Amendment was drafted, " 'effects' referred only to
personal property and particularly to goods or movables." *Altman
v. City of High Point*, 230 F.3d 194, 201 (4th Cir. 2003).

Keeping that backdrop in mind, the Court begins by examining
the purpose of CITES and the potential consequences of the
construction advocated by Claimants. CITES was enacted to
"provide a means whereby the ecosystems upon which endangered
species and threatened species depend may be conserved . . . ."
16 U.S.C. § 1531. Claimants advocate a liberal construction of
household effects that would permit people returning to the
United States from abroad to import multiple tons of an
endangered species without regulation, to enjoy the special

17

treatment afforded household effects. To carry such a position
to its natural conclusion obviates the fact that such an
interpretation would undermine the objectives of the statute.
The purpose of the statute is conservation. It is easy to see
how the drafters created an exemption for household effects based
presumably on the assumption that eligible items would be
sufficiently insignificant to contribute to the depletion of the
resources sought to be protected. However, were each individual
returning to the United States permitted to bring several *tons* of
an endangered or threatened species with them completely free of
government oversight, regulation, or tracking, it is obvious that
such a broad interpretation could easily lead to the depletion of
these resources that the statute was explicitly designed to
prevent.

Next, the Court turns to the language of the revised
statute, and notes that in order to qualify for the household
effects exemption, the quantity of the specimen must be
"reasonably necessary or appropriate for the nature of [the] trip
or stay." 50 C.F.R. § 23.15(d)(3). Under no conceivable or
appropriate definition could enough hardwood flooring to cover a
single-family home be considered reasonably necessary or
appropriate for any Government employee returning from a tour of
duty abroad. Returning to the plain meaning of the statute, an
ordinary interpretation would be that the statute was designed to

allow people returning home from abroad to bring back the items
that comprised their home while living abroad, so as to transfer
their household from one place to another. Such items might
include pots, pans, dishes, linens, sofas, chairs, beds, dressers
small items of furniture like coffee and end tables, and artwork
to name a few. The Court cannot fathom that Claimants would have
considered the installed parquet flooring in their domicile in
Panama so essential to their household that they would have
contemplated tearing out all of the flooring and bringing it back
with them, and similarly the Court holds that under no
reasonable, plain or ordinary interpretation of the term
household effects does several tons of *uninstalled* hardwood
flooring qualify as a household effect.

Finally, the Court examines how other statutes creating
exemptions for household goods or effects have either defined
these terms or how such terms have been defined by the courts.
The Fourth Circuit was presented with the opportunity to define
the term "household goods" in the bankruptcy context wherein 11
U.S.C. § 522(f) permitted "debtors to avoid liens on 'household
goods' that are 'held primarily for the personal, family, or
household use of the debtor or dependent of the debtor."
*McGreevy v. ITT Fin. Svcs.* 955 F.2d 957, 959 (4th Cir.
1992)(quoting 11 U.S.C. § 522(f)). The court in turn set out the
*per se* rule that " 'household goods' under section 522(f)(2)(A)

19

are those items of personal property that are typically found in or around the home and used by the debtor or his dependents to support and facilitate day-to-day living within the home, including maintenance and upkeep of the home itself." *Id.* at 961. Another statute setting forth an exemption for household effects is 19 C.F.R. § 148.52, which establishes a customs exemption from duties and taxes for household effects used abroad. The statute expressly states that the exemption covers "furniture, carpets, paintings, tableware, books, libraries and other usual household furnishings and effects actually used abroad . . . and not intended for any other person or for sale." 19 C.F.R. § 148.52.[6] An examination of other statutes designed to serve a similar purpose, exemption of certain possessions from regulation, indicate that such exemptions for household goods or effects are designed to protect a relatively narrow spectrum of goods, inextricably linked to the daily lives and functioning of a household. Multiple tons of hardwood flooring fit neither this definition nor purpose.

The Court therefore holds that the defendant wood does not qualify for the household effects exception to the Certificate of Origin requirement because despite the ambiguous language of the statute, the construction advocated by Claimants that would cover

---

[6] Although not made an issue in the litigation of this matter, it is absolutely conceivable that in light of the quantity of wood shipped by Claimants that it was intended for resale, or that others attempting to ship

such a large quantity of flooring is counter to the objectives of the statute, and irreconcilable with the plain meaning of the term "household effects" as well as the definition attached to the term in other comparable circumstances.

## 2. Innocent Owner Defense

The Court grants summary judgment in favor of the Government and against Claimants on the innocent owner defense because the circumstances of the exportation rendered defendant wood illegal for Claimants to possess in turn making the innocent owner defense unavailable to Claimants under the circumstances. In 2000 Congress passed the Civil Asset Forfeiture Reform Act (CAFRA), creating the following uniform innocent owner defense:

> (1) An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.
> (2)(A) With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who—
> (i) did not know of the conduct giving rise to forfeiture; or
> (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

18 U.S.C. § 983(d)(1) & (2)(2001). However, "[n]otwithstanding any provision of this subsection, no person may assert an

---

this quantity of goods would be doing so for the purpose of resale and not personal use.

ownership interest under this subsection in contraband or other property that it is illegal to possess." *Id.* at § 983(d)(4)

Only one other federal court appears to have addressed an issue similar to the one before this Court. In *United States v. 144,744 Pounds of Blue King Crab*, the Ninth Circuit was asked to decide whether an importer of king crab taken in violation of Russian fishing regulations and subject to forfeiture under the Lacey Act could assert an innocent owner defense in forfeiture proceedings. 410 F.3d 1131, 1132 (9th Cir. 2005). More specifically, the court examined whether the words of 18 U.S.C. § 983(d)(4), "contraband or other property that it is illegal to possess" was intended to be limited simply to items that are inherently illegal to possess. *Id.* Conducting an analysis of the plain language of the statute, the court reasoned that "Congress's use of 'other' following the 'or' also connotes that items besides 'contraband' were contemplated to be exempted from the innocent owner defense." *Id.* at 1135. The court went on to hold that "the phrase 'other property that it is illegal to possess' includes property that becomes illegal to possess because of extrinsic circumstances" and that "it is sufficient to determine that 'property that it is illegal to possess' includes items that may be legally possessed in some circumstances but that become illegal to possess in others." *Id.*

Although *Blue King Crab* involved a violation of the Lacey

22

Act, CITES and the issue presented in this case are sufficiently similar to what was before the Ninth Circuit to apply its reasoning in this case. The Court adopts the Ninth Circuit's interpretation of the scope of 18 U.S.C. § 983(d)(4) to the extent that it is applicable not only to contraband property, but also to property which it is illegal to possess owing to a specific set of circumstances. In light of the Court's finding that the defendant wood was exported to the United States in contravention of the provisions of CITES, it is appropriately deemed "property that it is illegal to possess." Therefore in accordance with 18 U.S.C. § 983(d)(4), the Court holds that Claimants are not entitled to the innocent owner defense and grants summary judgment in favor of the Government because defendant wood was illegally possessed by Claimants, and Claimants are therefore ineligible for the innocent owner defense.

## 3. Timeliness of Forfeiture

The Court denies Claimants' Motion for Summary Judgment based on untimely filing by the Government pursuant to the deadlines delineated in 18 U.S.C. § 983(a)(1) and (3) because both of these statutory provisions refer explicitly to administrative forfeitures, and this action has proceeded as a judicial forfeiture since its inception and there is no authority for the application of § 983(a)(1) and (3) to judicial

23

forfeiture. According to 18 U.S.C. § 983(a)(1)(A)(I), "in any *nonjudicial* civil forfeiture proceeding under a civil forfeiture statute, with respect to which the Government is required to send written notice to interested parties, such notice will be sent ... as soon as practicable, and in no case more than 60 days after the date of the seizure." 18 U.S.C. § 983(a)(1)(A)(I)(emphasis added). 18 U.S.C. § 983(a)(3) addresses forfeiture actions where a claim has been filed, and is worded as an implicit follow up to § 983(a)(2) that begins by addressing itself to "[a]ny person claiming property seized in a *nonjudicial* civil forfeiture." 18 U.S.C. § 983(a)(2)(emphasis added). Claimants entire timeliness argument is premised on these provisions,[7] yet they have failed to provide any support for the application of these provisions to *judicial* forfeitures such as theirs, nor has the Court been able to locate any such authority. The Court therefore denies Claimant's Motion for Summary Judgment based on the timeliness of the commencement of this action because the alleged statutory basis for their claim is inapplicable to this judicial forfeiture action.

---

[7]The Government's Reply Memorandum also includes argument pertaining to the timeliness of this action as evaluated under a constitutional due process standard presumably owing to this Court's March 25, 2008 Order where the Court declined to strike Claimants' affirmative defense of "unreasonable delay" noting that despite the affirmative defense being styled as based solely on the CAFRA provisions, that there was a remote possibility that Claimants intended to pursue this affirmative defense on constitutional grounds. However, Claimants elected not to proceed along this path in their Motion for Summary Judgment and for this reason, the Court declines to devote further attention to arguments regarding timeliness as a due process violation.

24

4. Due Process

The Court denies Claimants' Motion for Summary Judgment based on allegations of unconstitutional vagueness because the statute provides notice to a person of reasonable intelligence that the quantity of wood Claimants attempted to ship internationally failed to qualify as a household effect.  A statute or regulation must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The Fourth Circuit has held that

> "A statute can be impermissibly vague for either of
> two independent reasons.  First if it fails to
> provide people of ordinary intelligence a
> reasonable opportunity to understand what conduct
> it prohibits.  Second, if it authorizes or even
> encourages arbitrary and discriminatory
> enforcement."  But because we are condemned to the
> use of words, we can never expect mathematical
> certainty from our language."  As such a regulation
> is not void for vagueness unless it is so unclear
> with regard to what conduct is prohibited that it
> "may trap the innocent by not providing fair
> warning," or it is so standardless that it enables
> "arbitrary and discriminatory enforcement."
> Furthermore the degree of clarity required depends
> on the type of regulation. . . . The Court has ...
> expressed greater tolerance of enactments with
> civil rather than criminal penalties because the
> consequences of imprecision are qualitatively less
> severe.

*Greenville Women's Clinic v. Comm'r, S.C. Dept. of Health and Envtl. Control*, 317 F.3d 357, 366 (4th Cir. 2002)

Claimants position is that "[i]n the civil forfeiture action at hand, the statutory language of the Endangered Species Act,

the treaty language of CITES, and the plain language of DOI regulations promulgated for CITES implementation, did not provide fair notice to Claimants that their property would be subject to forfeiture in the circumstances." (Cl. Mot. Summ. J. 26.) The central issue here is whether the statute gave Claimants proper notice of what would and would not constitute household effects.

Claimants point to two emails by various officials involved in this litigation expressing uncertainty as to the applicability of the household effects exemption to the defendant wood as supporting the conclusion that the statutes at issue are unconstitutionally vague. Claimants neglect to acknowledge that at the time of these exchanges, neither official was aware of the complete circumstances surrounding the defendant wood, namely the *quantity* of wood involved. Regardless, the Court declines to find that a lack of unanimity on the application of the statutory provisions based on incomplete facts is in any manner dispositive of this issue. The Court is inclined however to agree with the Government's position that "it cannot be seriously argued that the common understanding of what would be involved in the movement's of ones' belongings from one household to another would normally include enough building material to replace the floors and doors *in an entire house* with over 2,000 square feet of living space." (Govt. Opp. Cl. Mot. Summ. J. 35.) It is virtually impossible to believe that a person of ordinary

intelligence and understanding would believe that this is typically or appropriately designated as a normal part of a household move. Claimants' weak arguments taken in conjunction with the level of deference and flexibility accorded statutes imposing civil penalties lead the Court to conclude that the statutes indicated by Claimants are not void for vagueness. Therefore, the Court denies Claimants Motion for Summary Judgment based on due process claims grounded in allegations of unconstitutional vagueness because Claimants have made an inadequate showing that someone of ordinary intelligence would be unable to ascertain from the relevant statutory provisions that this quantity of building materials would not qualify as household effects so as to be exempt from CITES's Certificate of Origin requirements.

## Valuation

The Court denies Claimants' Motion for Summary Judgment based on improper valuation because regardless of the value of the property and whether the Government initiated the forfeiture action as an administrative or a judicial forfeiture action, Claimants' decision to contest the forfeiture required the matter to proceed judicially, and therefore the procedural posture of this case and the ultimate outcome would have been the same. Following seizure, the retail value of the property must be ascertained. 7 C.F.R. § 356.2. If the property is valued at

27

less than $10,000 the property must be forfeited administratively, and if it is valued at more than $10,000 it must be referred to the United States Attorney's Office for the institution of forfeiture proceedings in the appropriate United States District Court. 7 C.F.R. § 356.3; 7 C.F.R. § 356.4. If after proper notification of the commencement of an administrative forfeiture, a claim is filed, the action must be converted to a contested judicial forfeiture. 19 U.S.C. § 1608.

Claimant devotes significant energy to contesting the manner in which the appraisal of the defendant wood was conducted and finding fault in the disparity in value produced by multiple appraisals. After all of this, Claimants conclude that the "correct" valuation was $6,400, and that therefore this action should have been commenced administratively and because it was not, they are entitled to summary judgment. The Court declines to entertain this dispute over the value of the wood because, if nothing else is clearly ascertainable from the voluminous record in this matter, it is certain that regardless of whether this forfeiture was commenced administratively or judicially, the Thompsons would have filed a claim contesting the forfeiture of their property. The matter would have been automatically transferred to this Court's jurisdiction and would have subsequently proceeded in the exact same manner that it has. 19 U.S.C. § 1608. The Court therefore denies Claimants' Motion for

28

Summary Judgment based on improper valuation of the defendant wood because even if the valuation had been determined as they preferred, their decision to contest the forfeiture would have resulted in the same procedural posture in this matter.

## 6. Eighth Amendment: Excessive Penalty

The Court denies Claimants' Motion for Summary Judgment based on allegations that the forfeiture of the defendant wood constitutes an excessive penalty because Claimants have failed to satisfy their burden of demonstrating that the forfeiture was grossly disproportionate by a preponderance of the evidence. 18 U.S.C. § 983(g) codifies the constitutional proscription against excessive fines and permits claimants in civil forfeiture actions to challenge such forfeitures as constitutionally excessive. In recent years, prior to the promulgation of § 983, the Supreme Court considered the application of the Excessive Fines Clause of the Eighth Amendment to forfeiture actions on two occasions-first in 1983 in *Austin v. United States* and again in *United States v. Bajakajian*, in 1998. *Austin v. United States*, 509 U.S. 602 (1993); *United States v. Bajakajian*, 524 U.S. 321 (1998). Following the issuance of those two opinions, the Fourth Circuit considered the implications of these two cases when read in conjunction with one another in *United States v. Ahmad*. 213 F.3d 805 (4th Cir. 2000). In *Austin*, the Court "held that the limitations imposed by the Excessive Fines Clause of the Eighth

Amendment apply to *in rem* civil forfeiture proceedings if the forfeiture, at least 'in part' constitutes punishment." See *Ahmad*, 2134 F.3d at 812 (summarizing *Austin*). In distinguishing between punitive and remedial forfeitures, the *Austin* Court concluded that "forfeiture generally and statutory *in rem* forfeiture in particular historically have been understood, at least in part, as punishment." *Austin*, 509 U.S. at 618. The Court went on to indicate that forfeitures involving the seizures of instrumentalities were more appropriately designated as remedial. *Id.* at 619. The Court's analysis stopped short, however, of setting out a test for determining whether a forfeiture is in fact constitutionally excessive. *Id.* at 622. Five years later, this issue returned before the Court in *Bajakajian*, and this time it chose to articulate a test for determining whether a punitive forfeiture violated the Excessive Fines Clause. The Court in *Bajakajian*, first created an unclear distinction between traditional and modern civil *in rem* forfeitures, indicating that "[t]raditional *in rem* forfeitures were ... not considered punishment against the individual for an offense" and that "[b]ecause they were viewed as nonpunitive, such forfeitures traditionally were considered to occupy a place outside the domain of the Excessive Fines Clause." *Bajakajian*, 524 U.S. at 331. These forfeitures were to be distinguished from more modern forfeiture statutes that have "blurred the

traditional distinction between civil *in rem* and criminal *in personam* forfeiture." *Id.* at n.6.[8] However, the Court gave very little guidance on categorizing forfeitures as traditional versus modern. In *Bajakajian* the property that was the subject of the forfeiture was money that Bajakajian failed to report upon exportation. The Government urged the Court to designate the cash a instrumentality on the basis that it not only facilitated the violation of the law, but was "the very *sine qua non* of the crime." *Id.* at 333. The Court declined to extend the definition of instrumentality as such, noting that "the currency in question is not an instrumentality in any event.... [It] is merely the subject of the crime of failure to report." *Id.* at 334 n.9. The Fourth Circuit in *Ahmad* would later read *Bajakajian* as setting forth the following factors for the next step in the Court's analysis—assessing the gravity of the offense: "the nature and extent of the criminal activity, other related illegal activities..., the extent of the harm caused by the offense, and the maximum penalties a court could have imposed for the

---

[8]In considering this portion of the *Bajakajian* opinion, the Fourth Circuit in *Ahmad* found that "not only did the *Bajakajian* Court recognize as the well-established rule that true civil *in rem* instrumentality forfeitures are exempt from the excessive fines analysis, but it also did nothing to change or limit this rule." *Ahmad*, 213 F.3d at 814. Scholars have disputed this reading by the Fourth Circuit, arguing that "[i]n *Ahmad*, the Fourth Circuit misread *Bajakajian* as exempting 'all true civil in rem instrumentality forfeitures' from excessive fines analysis. *Id.* If that was so then the police could civilly forfeit a $50,000 automobile based on the driver's possession of a single marijuana joint. But everyone recognizes that such a forfeiture is prohibited by the Excessive Fines Clause." 1 David B. Smith, Prosecution and Defense of Forfeiture Cases, § 12.11 (2008).

offense." *Ahmad*, 213 F.3d at 816. *Ahmad* was decided on May 25, 2000. CAFRA became law on August 23, 2000, and included the provisions of 18 U.S.C. § 983(g):

> (g) Proportionality-
> (1) The claimant under subsection (a)(4) may petition the court to determine whether the forfeiture was constitutionally excessive
> (2) In making the determination, the court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture.
> (3) The claimant shall have the burden of establishing that the forfeiture is grossly disproportional by a preponderance of the evidence at a hearing conducted by the court without a jury.
> (4) If the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment.

18 U.S.C. § 983(g). Few federal circuit courts have had the occasion to evaluate Excessive Fines Clause challenges to civil forfeitures under § 983(g).[9] For this reason it is reasonable to look at what has been written regarding reconciling the aforementioned Supreme Court precedent with recent statutory modifications.

> Congress essentially codified the *Bajakajian* decision in 18 U.S.C. § 983(g), enacted as part of the CAFRA. Although *Bajakajian* is a criminal forfeiture case, the codification applies only to civil forfeiture cases. It modifies or goes beyond what the Supreme Court held in several respects. First, it places the burden of establishing gross disproportionality on the claimant, by a

---

[9]The Fourth Circuit has not addressed this issue.

32

> preponderance of the evidence. Second, it makes
> clear that the excessiveness issue is to be decided
> by the court without a jury. Most importantly, it
> provides an excessiveness defense in any type of
> civil forfeiture; unlike *Bajakajian*, it does not
> distinguish between "traditional" civil forfeitures
> and "modern" civil forfeitures. Perhaps the
> drafters realized that such a distinction is
> unworkable and pointless.

1 DAVID B. SMITH, PROSECUTION AND DEFENSE OF FORFEITURE CASES, § 12.11
(2008).

Because the claimants have the burden of demonstrating that
the forfeiture was grossly disproportionate by a preponderance of
the evidence, the Court begins its analysis by examining the
arguments presented by Claimants. Claimants begin by citing the
relevant provisions of CAFRA as well as the test for gross
disproportionality delineated in *Bajakajian*. The Thompsons were
aware of their burden and the elements required to be
demonstrated in order to maintain this claim. In support of
their claim, Claimants' argument is essentially that they have
done nothing wrong. They begin by stating that "Claimants in the
instant case have not committed any crime or breached any duty
which would warrant punishment. Indeed they exercised every
manner of responsible conduct and due diligence expected of
foreign service officers in their positions." (Cl. Mot. Summ. J.
34.) They go on to describe the circumstances of the purchase of
the defendant wood, and how they were prepared to have the wood
shipped at their own cost, yet chose to consign it through the

embassy as "a matter of logistical convenience." (*Id.* at 35.)
Their argument continues by describing what had been shipped by
other foreign service officers without incident, and the measures
they took prior to consignment of their possessions in order to
"satif[y] themselves that no difficulties would accrue to the
Embassy." (*Id.*)   The Thompsons conclude by stating that

> In the circumstances, the Thompsons can hardly
> understand why they should be punished by the
> Government by having their property confiscated.
> Other foreign service officers who shipped the same
> types of items from Nicaragua were not penalized,
> asked to pay shipping costs, investigated by the
> State Department's Office of Inspector General, or
> had their property seized and brought for judicial
> forfeiture in a U.S. District Court.   These events
> happened during 2006-2008 only to the Thompsons.

(*Id.* at 36.)

Under no conceivable set of circumstances could this Court
conclude that Claimants have come anywhere close to carrying
their burden on this point.   Despite explicitly acknowledging the
criteria for making out this claim and their burden on this
point, the Thompsons have failed to provide any substantive legal
analysis that would support the Court finding in their favor
here.   Claimants have addressed none of the elements required for
a finding that a forfeiture was grossly disproportionate.   The
Court therefore denies Claimants Motion for Summary Judgment
based on an excessive penalty in violation of the Eighth
Amendment and CAFRA because Claimants have failed to carry their
burden owing to a failure to present any of the evidence or

argument required to maintain such a claim.

## III. CONCLUSION

The Court grants summary judgment in favor of the Government because there are no material issues of fact on the forfeitability issue—the defendant wood is *Dipteryx Panamensis*, a species listed in Appendix III of CITES, it was imported from abroad, a Certificate of Origin was not obtained, and it is not properly classified as a household effect. Furthermore, the Court grants summary judgment in favor of the Government because the Claimants are not entitled to an innocent owner defense because such a defense is unavailable when claimants are in possession of items that it is illegal to possess under the circumstances. The Court denies summary judgment in favor of Claimants Jill and Wilbur Thompson because the forfeiture action was not untimely filed, and even if it was, that would not mandate summary judgment in their favor. Furthermore, summary judgment is denied because Claimants were not deprived of due process based on a failure of the statutes to provide fair notice of prohibited conducts, any perceived impropriety with respect to the valuation of defendant wood does not entitle Claimants to summary judgment, and Claimants have failed to carry their burden required to make a claim that the forfeiture constitutes an excessive fine.

For the foregoing reasons, it is hereby

ORDERED that the Government's Motion for Summary Judgment is

GRANTED.  It is further

ORDERED that Claimants Jill and Wilbur Thompson's Motion for
Summary Judgment is DENIED.

The Clerk is directed to forward a copy of this Order to
counsel.

Entered this _24th_ day of November, 2008.


Alexandria, Virginia                            /s/
11/ 24 /08                            Gerald Bruce Lee
                                      United States District Judge